07 CV 11035

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

SIMONSEN CHARTERING APS and
REDERIET M.H. SIMONSEN APS,

     Plaintiffs,

 - against -

FONNSHIP A/S and GULLFONN MANAGEMENT
A/S,

     Defendants.

------------------------------------------------------------X

07 CV _____

ECF CASE

RECEIVED
DEC 0 5 2007
U.S.D.C. S.D. N.Y.
CASHIERS

## VERIFIED COMPLAINT

Plaintiffs, SIMONSEN CHARTERING APS ("Simonsen Chartering") and REDERIET

M.H. SIMONSEN APS ("Rederiet Simonsen")(collectively "Plaintiffs"), by and through their

attorneys, Lennon, Murphy & Lennon, LLC, as and for their Verified Complaint against the

Defendants, FONNSHIP A/S ("Fonnship") and GULLFONN MANAGEMENT A/S

("Gulfonn")(collectively "Defendants") allege, upon information and belief, as follows:

1.  This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the

breach of a maritime contract of charter. This matter also arises under the Court's federal

question jurisdiction within the meaning of 28 United States § 1331.

2.  At all times material to this action, Plaintiffs were, and still are, both foreign

corporations, or other business entities, organized under, and existing by virtue of foreign law

and were at all material times, and remain, the charterers of the motor tanker "SAVA STAR"

(renamed "ORASTAR") (hereinafter the "Vessel").

3.    Upon information and belief, Defendant Fonnship was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of the laws of Norway with a place of business at 5953 Fonnes, Norway and was at all material times the owner of the Vessel.

4.    Upon information and belief, Defendant Gullfonn was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of the laws of Norway with a place of business at 5953 Fonnes, Norway and was at all material times the manager of the Vessel. Upon further information and belief, Defendant Gullfonn was the alias, partner, joint venturer and/or paying, or receiving, agent of the Defendant Fonnship.

5.    By a long term time charter party dated April 11, 2003, Plaintiffs time chartered the Vessel from Defendant Fonnship for a period of four (4) years, 15 days more or less in Plaintiffs' option, with up to six (6) further extensions of one year each in Plaintiffs' option. A copy of the charter party is attached hereto as Exhibit 1.

6.    Pursuant to that agreement to charter the Vessel, and in order to comply with their obligations thereunder, Defendant Fonnship also agreed to convert the Vessel from a dry cargo vessel to a vessel that would be capable of carrying the various cargoes (mainly liquid) being listed in the charter party as cargoes which the Vessel would remain capable of carrying throughout the duration of the charter party.

7.    Plaintiffs for their part chartered the vessel in order to carry some 140 different "FOSFA" cargoes as were listed in the charterparty, including, but by no means limited to, vegetable and animal oils and ligno sulphonate.

8.    The charter party included at clauses 46 and 70 Defendant Fonnship's express warranties to the Plaintiffs that the Vessel would be able to carry a list of those cargoes referred

to in the charter party and further to carry those cargoes in conformity with the "International Convention for the Prevention of Marine Pollution from Ships" (hereinafter "Marpol regulations"), issued by the International Maritime Organisation ("IMO") and being currently in force or as amended from time to time.

9.      Revisions to the Marpol regulations, which came into force and effect on January 1, 2007, defined more narrowly the class of vessels that are permitted to carry various cargoes, and in particular vegetable oil cargoes. The result is that the Vessel, unless modified and/or rebuilt in order to conform with the Marpol and IMO regulations, is now able to carry only 24 different types of liquid cargoes, versus the 140 types it was warranted to carry under the charter party.

10.     Defendant Fonnship delivered the Vessel into the service of the Plaintiffs at Gdansk, Poland on or about October 25, 2004 following the conversion of the Vessel from a dry cargo vessel to a product tanker. Plaintiffs have at all times fully performed their duties and obligations under the charter party.

11.     Due to the failure of the Defendant Fonnship to modify and/or rebuild the Vessel to conform with the revised Marpol regulations, as it was required to do under the charter party, which constitutes Defendant Fonnship's breach of the charter party, since January 1, 2007 the Vessel has been unable to be employed by the Plaintiffs for carriage of a number of different cargoes, including vegetable oil cargoes, as it was previously.

12.     As a result of Defendant Fonnship's breach of the charter party due as aforesaid, Plaintiffs have sustained damages and are continuing to sustain damages, as best as may presently be approximated but which is expected to increase over the duration of the charter party, in the total principal amount of $994,651 consisting of lost cargoes that otherwise could

3

have been carried on the vessel, this principal amount being exclusive of interest, arbitration costs and attorneys' fees.

13.    Pursuant to the charter party, disputes between the parties are to be resolved in the English Courts and subject to English law. Plaintiffs have filed and served their Claim Form, and revised Claim Form, on the Defendant Gullfonn. A copy of Plaintiffs' Amended Claim Form is attached hereto as Exhibit 2.

14.    This action is brought in order to obtain jurisdiction over Defendants and also to obtain security for Plaintiffs' claims and in aid of the English Court proceeding.

15.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. As best as can now be estimated, Plaintiffs expect to recover the following amounts as the prevailing party:

| | | |
|---|---|---|
| A. | Principal claims: | $994,651; |
| B. | Estimated interest on claims -<br>3 years at 5.5% compounded quarterly: | $177,115; |
| C. | Estimated arbitration costs: | $75,000; and |
| D. | Estimated attorneys' fees and expenses: | $175,000.00. |
| **Total:** | | **$1,421,766.** |

16.    Upon information and belief, Defendant Gullfonn acts as paying agent, and/or receiving agent, or arranges for other non-parties to satisfy the debts and obligations of Defendant Fonnship, and/or receive payments being made to Defendant Fonnship. In particular, it is expected that Defendant Gullfonn may soon receive funds being paid to Defendant Fonnship for the sale of the Vessel.

17.    It is not common practice in the maritime industry, nor any other business, for an independent company to pay another company's debt, or receive another part's payments, where it has no formal relationship to the underlying contract.

18.    The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendants.

19.    The Plaintiffs seek an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendants held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendants and to secure the Plaintiffs' claim(s) as described above.

**WHEREFORE**, Plaintiffs pray:

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against them;

B.    That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies,

tangible or intangible, or any other funds up to the amount of **$1,421,766** belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for their benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

    C.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

    D.    That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court as a matter of comity;

    E.    That this Court award Plaintiffs the attorneys' fees and costs incurred in this action; and

    F.    That the Plaintiffs have such other, further and different relief as the Court may deem just and proper.

6

Dated:      New York, NY
                December 5, 2007

> The Plaintiffs,
> SIMONSEN CHARTERING APS and
> REDERIET M.H. SIMONSEN APS
>
> By: _____
>     Nancy R. Peterson
>     Kevin J. Lennon
>
> LENNON, MURPHY & LENNON, LLC
> 420 Lexington Avenue, Suite 300
> New York, NY 10170
> (212) 490-6050 - phone
> (212) 490-6070 - facsimile
> kjl@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York    )
                     )    ss.:    City of New York
County of New York   )

1.    My name is Nancy R. Peterson.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am an associate in the firm of Lennon, Murphy & Lennon, LLC attorneys for

the Plaintiffs.

4.    I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiffs is that the Plaintiffs are business organizations with no officers or directors now

within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiffs and agents

and/or representatives of the Plaintiffs.

7.    I am authorized to make this Verification on behalf of the Plaintiffs.

Dated:    New York, NY
          December 5, 2007

Nancy R. Peterson

8

# EXHIBIT 1

Code word for this Charter Party
"SHELLTIME 4"

*Issued December 1984*

# Time Charter Party

Tønsberg 11th April 2003

IT IS THIS DAY AGREED between *Fonnship AS* OF 5953 Fonnes, Norway (hereinafter referred to as "Owners", being owners of the good vessel called *M/T "Sava Star" See additional clause 41.* (hereinafter referred to as "the vessel") described as per main terms Clause 1 hereof and of Simonsen Chartering Aps, Svendborg, Denmark instead Rederiet M.H. Simonsen; Svendborg *always to be responsible for Charterers fulfilment of this charter.* (hereinafter referred to as "Charterers"):

1 2 3 4 5 6 7 8 9 10 11 12 13 14

Description and
Condition of
Vessel

1.    At the date of delivery of the vessel under this charter

(a)    she shall be classed; B.V.

(b)    she shall be in every way fit to carry See additional clause 44 and/or its products;

(c)    she shall be tight, staunch, strong in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator and radar) in a good and efficient state;

(d)    her tanks, valves and pipelines shall be oil-tight;

(e)    she shall be in every way fitted for burning gasoil for main engine, boilers and auxiliary — See additional clause 67

~~at sea—fueloil with a maximum viscosity of — Centistokes at 50 degrees Centigrade co-par — any commercial grade of fueloil~~

~~(IAGFO") for main propulsion;~~

~~AGGFO for auxiliaries~~

~~in port; marine diesel /AGGFO for auxiliaries~~

(f)    ~~she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals by day and night without delay;~~

(g)    she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her perform the charter service without delay;

(h)    *she shall comply with the description in Form B as per additional clause 45 appended hereto provided however that if there is any conflict between the provisions of Form B and as per additional clause 45 any other provisions, including this Clause I, of the charter such other provisions shall govern.*

Shipboard
Personnel
and their duties

2.    (a)    At the date of delivery of the vessel *and throughout the period* under this charter

(h)    she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be trained to operate the vessel and her equipment competently and safely;

(ii)    all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state;

(iii)    all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention of Standards of Training, Certification and Watchkeeping for Seafarers, 1978;

(iv)    there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried out quickly and efficiently.

(b)    Owners guarantee that throughout the charter service the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers,

(i)    prosecute all voyages with the utmost despatch;

(ii)    render all customary assistance; and

(iii)    load and discharge cargo as rapidly as possible when required by Charterers or their agents to so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state.

Duty to
Maintain

3.    (i)    Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain *at a mutually convenient time* or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.

(ii)    If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost.

Attachment 1

2

Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 24.

(iii) If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence.

Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the option to terminate this charter by giving notice in writing with effect from the date on which such notice of termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without prejudice to any rights of the Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers' rights under Clause 21 hereof).

**Period Trading Limits**

4.        Owners agree to let and Charterers agree to hire the vessel for a period of 4 years timecharter 15 days more or less in charters option. Charterers option 1 option 1 option 1 option 1 year option 1 year. Each optional year 15 days more or less in Charterers option . Unless Charterers are giving redelivery notice minimum 3 months prior to expiry of the running period then the forthcoming optional year is automatically renewed. See also clause 76. Commencing from the time and date of delivery of the vessel, for the purpose of carrying lawful merchandise (subject always to Clause 28) including in particular See additional clause 42

~~in any part of the world, as Charterers shall direct~~ See additional clause 43 subject to the limits of the current British Institute Warranties and any subsequent amendments thereof. Notwithstanding the foregoing, but subject to Clause 35, ~~Charterers may order the vessel to dan bound waters or to any part of the world outside Institute Warranty Limits such limits provided that Owners consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters as a consequence of such order.~~ See additional clause 43

Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do  warrant the safety of any place to which they order the vessel and shall be under ~~no~~ liability in respect thereof ~~except for loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above,~~ the vessel shall be loaded and discharged at any places as Charterers may direct, provided that Charterers  shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIFM Ship-to-Ship Transfer Guide. See additional clause 64

The vessel shall be delivered by Owners at a port in DOP 1 safe port   UK-Continent or Mediterranean, where the vessel will be rebuilt, free of slop and washing/water and with load/ready tanks.

At Owners' option and redelivered to Owners at a port in DOP 1 safe port within vessels trading area free of slop and washing/water

At Charterers' option

**Laydays/ Cancelling**

5. The vessel shall not be delivered to Charterers before 1st August 2009  and Charterers shall have the option of cancelling this charter if the vessel is not ready and at their disposal on or before 30th September 2009. Owners to give 21/14/7/3/1 days delivery notice.

**Owners to Provide**

6.        Owners undertake to provide and to pay for all provisions, wages and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for water for crew; for all drydocking, overhaul, maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire.

**Charterers to Provide**

7. Charterers shall provide and pay for all fuel (except ~~fuel used for domestic services~~), towage and pilotage and shall pay all agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges for

3

the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners'   125
purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance   127
made good and taken into account under Clause 21 or 22); and provided further that any fuel used in connection   128
with a general average sacrifice or expenditure shall be paid for by Owners. See additional clause 44   129
130

**Rate of Hire**

8.  Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate *of*   131
*Euro 3.895,-* per day, and pro rate for any part of a day, from the time and date of her delivery   132
(local time) until the time and date of her redelivery (local time) to Owners. *See additional clause*   133
*44.*   134
135
136

**Payment of Hire**

9.  Subject to Clause 3(iii), payment of hire shall be made in immediately available funds to :   137
138
139

*Owner's designated bank account*   140
141

Account   142
~~per calender month~~ *every 15 days* in advance, less:   143
in_____   144
(i)  any hire paid which Charterers reasonable estimate to relate to off-hire periods, and   144
(ii)  any amounts disbursed on Owners' behalf, any advances and commissions thereon, and   145
charges which are for Owners' account pursuant to any provision hereof, and   146
(iii)  any amounts due or reasonable estimate to become due to Charterers under Clause 3(iii)   14
14
or 24 hereof,   14
any such adjustments to be made at the due date for the next semimonthly payment after the facts have been   14
ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners'   14
account provided that Charterers have made proper and timely payment.   15
In default of such proper and timely payment,   15
(a)  Owners shall notify Charterers of such default and Charterers shall within seven *working* days of   15
receipt of such notice pay to Owners the amount due including interest, failing which Owners may withdraw the   15
vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter   1:
or otherwise; and   1:
(b)  Interest on *any* amount due but not paid on the due date shall accrue from the day after that date   1:
up to and including the day when payment is made, at the rate per annum which shall be 1% above the U.S.   1:
Prime Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due   1
date, or, if no such interest rate is published on that day, the interest rate published on the next preceeding day on   1
which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months,   1
compounded semi-annually.   1

**Space Available to Charterers**

10.  The whole reach, burthen and decks of the vessel and any passenger accommodation (including   1
Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's   1
master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on
board shall not, unless specially agreed, exceed *about 25* tonnes at any time during the charter period,
*excluding fresh water and bunker.*

**Overtime**

11.  ~~Overtime pay of the master, officers and crew in accordance with ship's articles shall be for~~
~~Charterers' account when incurred, as a result of complying with the request of Charterers or their~~
~~agents, for loading, discharging, heating of cargo, bunkering or tank-cleaning.~~

**Instructions and Logs**

12.  Charterers shall from time to time give the master all requisite instructions and sailing directions, and
he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as
required. The master shall when required furnish Charterers or their agents with a true copy of such log and
with properly completed loading and discharging port sheets and voyage reports for each voyage and other
returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such
documents which are not provided by the master.

**Bills of Lading**

13.  (a)  The master (although appointed by Owners) shall be under the orders and direction of
Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as
Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter.
Charterers hereby indemnify Owners against all consequences or liabilities that may arise
(i)  from signing bills of lading in accordance with the directions of Charterers, or their agents, to
the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as
provided in Clause 13(b)) from the master otherwise complying with Charterers' or their agents' orders;
(ii)  from any irregularities in papers supplied by Charterers or their agents.
(b)  Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from
Charterers to discharge all or part of the cargo

4

(i) at any place other than that shown on the bill of lading and/or

(ii) without presentation of an original bill of lading

unless they have received from Charterers both written confirmation of such orders and an indemnity in a form acceptable to Owners. See additional clause 52.

**Conduct of Vessel's Personnel**

14. If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible.

**Bunkers at Delivery and Redelivery**

15. Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then current market prices at the port of delivery or redelivery, as the case may be, or if such prices are not available payment shall be at the then-current market prices at the nearest port at which such prices are available; provided that if delivery or redelivery does not take place in a port payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to time, if so required by Charterers, provided suppliers agree. See additional clause 46.

**Stevedores, Pilots, Tugs**

15. Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboats personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that

(i) the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and

(ii) Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores.

**Supernumeraries**

17. Charterers may send representatives in the vessel's available accommodation upon any voyages made under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors, Charterers paying at the rate of Euro 12 per day for each representative while on board the vessel.

**Sub-letting**

18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter.

**Final Voyage**

19. If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for -

(i) disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and

(ii) Bunker on board at redelivery pursuant to Clause 15.

Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers.

If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be.

**Loss of Vessel**

20. Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.

**Off-Hire**

21. (a) On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner)

190
191
192
193
194
195
196
197
198
199
200
201
202
203
204
205
206
207
208
209
210
211
212
2
2
2
2
2
2
2
2
2
2

5

(i)  due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than three hours (if resulting from partial loss of service); or

(ii)  due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew or

(iii)  for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), and such loss continues for more than three consecutive hours; or

(iv)  due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or

(v)  due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); then

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between

(i)  the time the vessel would have required to perform the relevant service at such guaranteed speed, and

(ii)  the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.

(c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby.

(d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.

(e) Time during which the vessel is off-hire under this charter shall count as part of the charter Period.

Periodical
Drydocking

22.  Owners have the right and obligation to dire drydock the vessel at regula intervals of
On each occasion Owners shall propose to Charterers a date on which they wish to drydock the vessel, not less than 3 weeks before such date and Charterers shall offer a port for such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as practicable.

Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of lading or this charter

(b) If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to

254
255
256
257
258
255
260
261
262
263
264
265
266
265
266
266
266
267
267
27
27
27
27
27
27
2·
2'
2·
2
2
2
2
2
2
2
2
2
z

6

resume Charterers' service and is at the position at which she went off-hire or a position no less favourable to 318
Charterers, whichever she first attains. However, 319

(i) Provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to 320
the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, 321
whether lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and 322

(ii) any additional time lost in further gas-freeing to meet the standard required for hot work or 323
entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there. 324

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any 325
calculation under Clause 24. 326

The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners 327
account. 328

(c) If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical 329
drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to 330
proceed to the special port until she next presents for loading in accordance with Charterers' instructions, 331
provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at 332
the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but 333
Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage 33
Calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any 33
benefit they may gain in purchasing bunkers at the special port. 33

Charterers shall insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning 33
necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers 33
calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port. 33

 

**Ship Inspection**    25. Charterers shall have the right at any time during the charter period to make such inspection of the 34
vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers 34
in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all 3·
necessary co-operation and accommodation on board provided, however, 3·

(i) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise 3·
or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or 3.
responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase 3
Charterers' responsibilities to Owners or third parties for the same, and 3

(ii) that Charterers shall not be liable for any act, neglect or default by themselves, their 3
servants or agents in the exercise or non-exercise of the aforesaid right 3

 

24. (a) Owners guarantee that the speed and consumption of the vessel shall be as follows: Minimum 11 3
knots at maximum beaufort 4, with consumption of maximum 6 mt/day. 3

| | ~~Maximum average bunker consumption~~ | |
|---|---|---|
| **Detailed**  ~~Average speed~~  ~~is knots~~ | ~~main propulsion~~ | ~~auxiliaries~~ |
| **Description** | ~~fuel oil/diesel oil~~ | ~~fuel oil/marine diesel oil~~ |
| **and**  ~~Laden~~ | ~~tonnes~~ | ~~tonnes~~ |
| **Performance** | | |

~~Ballast~~

 

See additional clause 41.

The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning
and shall be pro-rated between the speeds shown.

The service speed of the vessel is *11* knots laden and in ballast- *Beaufort 4* and in the absence
of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one
laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to
steam at any speed within the range set out in the table (the "ordered speed").

If the vessel is ordered to proceed at any speed other than the highest speed shown in the table,
and the average speed actually attained by the vessel during the currency of such order exceeds such ordered
speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating any increase or
decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed
actually attained.

For the purposes of this charter the "guaranteed speed" at any time shall be the then-current
ordered speed or the service speed, as the case may be

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be
calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each

7

period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22 (b) (i) 382
would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction 383
of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds 384
exceed force 8 4 on the Beaufort Scale for more than 12 hours. 385

(b)  if during any year from the date on which the vessel enters service (anniversary to anniversary) 386
The vessel falls below or exceeds the performance guaranteed in Clause 24 (a) and additional Clause 41 the if 387
such shortfall or excess results 338

(i)  from a reduction or an increase in the average speed of the vessel, compared to the speed 339
guaranteed in Clause 24 (a) then an amount equal to the value of the hire rate of the time so lost or gained, as the 390
case may be, shall be deducted from or added to the hire paid : 391

(ii)  from an increase or a decrease in the total bunker consumed, compared to the total 392
bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24 (a) and amount 392
equivalent to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on 39(
the average price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to 39
the hire paid. 39(

The addition to or deduction from hire so calculated for laden and ballast milage respectively 39'
shall be adjusted to take into account the milage steamed in each such condition during Adverse Weather 39
Periods, by dividing such addition or deduction by the number of miles over which the performance has been 35'
calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather 40
Periods, in order to establish the total addition to or deduction from hire to be made for such period. 40

Reduction of hire under the foregoing sub Clause (b) shall be without prejudice to any other 40
remedy available to Charterers. 40

Calculations under this Clause 24 shall be made for the yearly 6 month periods terminating on 40
each successive anniversary of the date on which the vessel enters service, and for the period between the last 46
such anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of 4(
hire arising under this Clause during the final year or part year of the charter period shall in the final instance be 4(
settled in accordance with Charterers' estimate made two months before the end of the charter period.  Any 4(
necessary adjustment after this charter terminates shall be made by payment by Owners to Charterers or by 4(
Charterers to Owners as the case may require. 4:
Payments in respect of increase of hire arising under this Clause shall be made promptly after receipt by 4:
Charterers of all the information necessary to calculate such increase. 4'
4

Salvage    25.    Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any 4
damage to or loss of the vessel or tortuous liabilities to third parties) incurred in saving or attempting to save life 4
or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided 4
that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of 4
services rendered under Clause 25. 4

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers 4
after deducting the master's, officers' and crew's share. 4

Lien    26.    Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any 4
amounts due under this charter, and Charterers shall have a lien on the vessel for all monies paid in advance and 4
not earned, and for all claims for damages arising from any breach by Owners of this charter. 4

Exceptions    27.    (a)  The vessel, her master, and Owners shall not, unless otherwise in this charter expressly 4
provided, 4
be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the
master, pilots, mariners or other servants of Owners in the navigation or management of the vessel and cargo;
fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the
sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery;
provided, however, that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing.  Further, neither the
vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable
for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of
war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil
commotions or arrest or restraint of princes, rulers or people.

(b)  The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels
in distress and to deviate for the purpose of saving life or property.

(c)  Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant
person in respect of

(i)   loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane
or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter,
whether or not such works or equipment belong to Charterers, or

(ii)  any claim (whether brought by Charterers or any other person) arising out of any loss of or
damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules, or the Hague

8

Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the Hague-Visby Rules.

(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire.

**Injurious Cargoes**

28.    No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments.

**Grade of Bunkers**

29.    Charterers shall supply ~~gasoil oil/fuel oil with a maximum viscosity of ... Centistokes at 50 degrees Centigrade/ACGEO for main propulsion and diesel oil ACGEO for the auxiliaries~~. *Main engine,boilers and auxiliaries, in accordance to additional clause 67.* If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof.

Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading Company and with its specification for marine fuels as amended from time to time.

**Disbursements**

30.    Should the master require advances for ordinary disbursements at any port, Charterers or their agent shall make such advances to him, ~~in consideration of which Owners shall pay a commission of two-and-a-half per cent~~, and all such advances and commission shall be deducted from hire.

**Laying-up**

31.    Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made by Owners as a result of such lay-up. Charterers may exercise the said option any number of times during the charter period.

**Requisition**

32.    Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the vessel shall be off-hire during the period of such requisition, any hire paid by such government in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period.

**Outbreak of War**

33.    If war or hostilities break out between any two or more of the following countries: U.K., Russia or countries of the EU both Owners and Charterers shall have the right to cancel this charter.

**Additional War Expenses**

34.    If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.

**War Risks**

35.    (a) The master shall not be required or bound to sign bills of lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions.

(b) If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of peril). If any place or discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

(c) The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority or by any committee or person having

9

under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of Shipping War Risks Clause 1952.

**Both to Blame Collision Clause**

36.    If the liability for any collision in which the vessel is involved while performing this charter falls to be determined in accordance with the laws of the United States of America, the following provision shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier."

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be determined in accordance with the laws of the United States of America.

**New Jason Clause**

37.    General average contributions shall be payable according to the York/Antwerp Rules, 1974 as amended 1994, and shall be adjusted in London in accordance with English law and practice but should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo."

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery."

Charterers shall procure endeavour to ensure that all bills of lading issued under this charter shall contain a provision in the foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and practice of the United States of America.

**Clause Paramount**

38.    Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the following clauses:

"(1) Subject to sub-clause (2) hereof, this bill of lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading, signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the Hague-Visby Rules."

"(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading, to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules. Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules."

"(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules if applicable, such term shall be void to that extent but no further."

"(4) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law."

**TOVALOP**

39.    Owners warrant that the vessel is:

10

(i)    a tanker in ~~TOVALOP~~ *ITOPF* and
(ii)    properly entered in Terra Nova, UK

and will so remain during the currency of this charter.

~~When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution~~
~~Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the~~
~~escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or~~
~~not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to~~
~~Owners or master, undertake such measures as are reasonably necessary to prevent or minimise such Pollution~~
~~Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners~~
~~advised of the nature and result of any such measures taken by them and, if time permits, the nature of the~~
~~measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be~~
~~deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that:~~

~~(1)    any such escape or discharge of Threat was caused or contributed to by Charterers; or~~
~~(2)    by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International~~
~~Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied in such~~
~~escape or discharge or to the Threat, would have been exempt from liability for the same; or~~
~~(3)    the cost of such measures together with all other liabilities, costs and expenses of Owners~~
~~arising out of or in connection with such escape or discharge of Threat exceeds one hundred and sixty United~~
~~States Dollars (US $160) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United~~
~~States Dollars (US $16,800,000), whichever is the larger, save and insofar as Owners shall be entitled to recover~~
~~such excess under either the 1971 International Convention on the Establishment of an International Fund for~~
~~Compensation for Oil Pollution Damage or under CRISTAL;~~

~~PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures~~
~~should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to~~
~~continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this~~
~~Clause 39 shall thereupon cease.~~

~~The above provision are not in derogation of such other rights as Charterers or Owners may~~
~~have under this charter or may otherwise have or acquire by law or any International Convention or TOVALOP.~~
~~The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability~~
~~for Oil Pollution dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the~~
~~Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as~~
~~amended from time to time. The terms "Oil", "Pollution Damage", and "Tonnage" shall for the purpose of this~~
~~Clause 39 have the meanings ascribed to them in TOVALOP.~~

Export
Restrictions

40. The charter shall not be required or bound to sign bills of lading for the carriage of cargo to any place
in which export or such cargo is prohibited under the laws, rules or regulations of the country in which the cargo
was produced and/or shipped.

Charterers shall procure that all bills of lading issued under this charter shall contain the following
clause:

"If any laws rules or regulations applied by the government of the country in which the cargo was
produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo
to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to
require cargo owners forthwith to nominate an alternative discharge place for the discharge of the
cargo, or such part of it as may be affected, which alternative place shall not be subject to the
prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and
discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72
hours after they or their agents have received from carriers notice of such prohibition, carriers shall be
at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe
place on which they or the master may in their or his absolute discretion decide and which is not
subject to the prohibition, and such discharge shall constitute due performance of the contract
contained in this bill of lading so far as the cargo so discharged is concerned".

The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading
being deemed to be references to this charter.

Law and
Litigation

41. (a)  This charter shall be construed and the relations between the parties determined in accordance
with the laws of England.
(b)  Any dispute arising under this charter shall be decided by the English Courts to whose
jurisdiction the parties hereby agree. –As per additional clause 44.
~~(c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain~~
~~the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect~~
~~to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the~~
~~provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being~~

574
575
576
577
578
579
580
581
582
583
584
585
586
587
588
589
590
591
592
593
594
595
596
597
598
599
600
601
602
603
604
605
606
607
608

ADDITIONAL CLAUSES TO
M/T "Sava Star"/Simonsen Chartering Aps, Svendborg

C/p date: 11th April 2003

Vessel:

M/T "SAVA STAR"

The warranted particulars and capacities of the vessel and its equipment as shown in clause 45.

Clause 43:

the terms of this charter may also be extended by Charterers for period of all, or any part, of the time the vessel is off-hire during firm period and/or optional period(s)

Clause 44:

Insertion to read: in case of disputes not exceeding Dkk 200,000, same to be referred to Copenhagen Sø & Handelsret under danish law according to small claims procedure as currently in force.

Clause 45:

| | |
|---|---|
| Name and ex-names of vessel | : m/T "Sava Star" |
| Type of vessel | : FLS tanker |
| Imo/Imo number | : 8719102 |
| Built/when/where/yard | : 1992 Sava Shipyard, Macvan, Mitrovica |
| Flag | : Panama |
| Homeport | : Panama |
| Call sign | :3FMC3 |
| Full class description | :BV+ 1 hull and Machinary, FLS tanker |
| flash point >60 deg C, unrestricted navigation + aut - ums | |
| Double bottom (yes/no) | : yes |
| Double sides (yes/no) | : yes |
| Double hull (yes/no) | : yes |

| | |
|---|---|
| Summer deadweight all told | : 3.630 mts |
| Summer draft even keel | : 6,99 m |
| Summer freeboard | : 1,61 m |
| Summer tpcm | : 8,43 tons/cm |
| Cargo capacity summer | : 3.437 mts |

| | |
|---|---|
| Winter deadweight all told | :3.546 |
| Winter draft even keel | :6,867 m |
| Winter freeboard | :1,733 m |
| Winter tpcm | :8,43 ton/cm |
| Cargo capacity winter | : 3.333 mt |
| Freeboard in sbt condition | :4,75 m |

| | |
|---|---|
| GT / NT | : to be advised |
| Deduction for sbt | :to be advised |
| LOA | : 74,65 m |
| LBP | :69,10 m (to be verified) |
| Beam | : 12,70 m |
| Depth moulded | : 8,60 m |
| Airdraft | : Ballast 28,0 m / Loaded 25,76 m |
| Parallel body length in ballast:29,0 m | |
| Parallel body length in light condition: to be verified after rebuilt | |
| Parallel body length in full condition: 45,00 m | |

Fixed fendering (yes/no)   :No

Number of tanks incl. sloptank(s) : 10
Coated tanks fully coated with no loose scales and blisters (yes/no) : yes
Type of coating                          : Marineline 784
Stainless steel tanks (type)             : N o
Cubic capacity (98 pct)                  : 3,639,92 cbm incl sloptanks
Sloptank('s) capacity (98 pct)           : to be advised
Ballast tanks capacity                   : 1.200 cbm
Temperature vessel can maintain on any
type of cargo                            : 85 deg C.
Heating medium                           : Steam
Stainless steel coils (yes/no)           : yes
Maximum loading temperature              : 85 Deg C
Make/type/capacity of boiler(s)          : to be advised  2 x 3.000 Kg/hour

Fueloil capacity                         : N/A
Diaseloil capacity                       : 141 m/tons sg 0,85
Lubeoil capacity                         : 3 mtons
Fresh water capacity                     : 52 tons technical + 17 tons
                                           drinking water

Cargo lines - diameter/made of           :8 " - stainless steel.
Number of manifolds each side            : 5
Number og cargo lines on manifold        : to be advised after rebuilt
Height of manifold from deck             : to be advised after rebuilt
Distance rail to manifold                : to be advised after rebuilt
Distance bow to center manifold          : to be advised after rebuilt
Distance between manifolds               : to be advised after rebuilt
Permanenent stern line fitted (yes/no) : No
Number and size of reducers              : to be advised after rebuilt

Segregation with separate lines/pumps   :3
Segregations sharing pumps/lines using double valves: 10
Loading rate                             : minimum 600 cbm/hour

Operational lgs (yes/no)                 :No
Operational cow system (yes/no)          : No
Operational tank gauging system (y/n)    :No
Operational closed loading (yes/no)      :No
Operational Vapour return line (y/n)     :No
U.S. coast guard approved (yes/no)       :No
Oil discharge monitor equipment(yes/no):Yes
Compressed air equipment for effective
blowing of lines (yes/no)                : yes
Closed sampling (yes/no)                 :yes

Type of cargo pumps                      :Prinz screw pumps electrical driven
Number of cargo pumps                    : 3
Capacity each pump water/h               : 250 cbm/hour
Number of pumps able to work simultaneously :3
Max. number of grades to be loaded simultaneously : 3
Max. number of grades to be discharged simultaneously :3

Number/length/diamer of mooring ropes : 4 x 110 m x 40 mm
Single point mooring (yes/no)            : yes
Towing bracket aft (yes/no)              :No

Type and design of main engine           :Bergen diesel KRM 8
Horsepower revs/min                      : 2.000 HP - 750 rpm
Type and design of generators            : Scandia DS 11
Horsepower revs/min                      : 220 kva - 1.500 rpm
Type and design of bowthruster           : Ulstein 90TV

Horsepower revs/min : 300 hp
Shaft generator capacity : 550 kva

Minimum guaranteed average speed Load/ballast, upto bf4 : 11 knots

Cleaning system for tankcleaning :fixed tankcleaning machines
Number of b-w machines operative
simultaneously : minimum 4
Number of b-w machines onboard : Minimum 6
Diameter on opening of nozzles : ~ 7 or 8 mm
Temperature obtainable on clean-water :90 deg C
Capacity cleaningwater pr. hour : 80 cbm/hr
Time consumed on 1 cleaning circuit : to be advised

Max consumption per day : 6,0 mt excl tankcleaning &
heating
Oil consumption tankcleaning : to be advised
Oil consumption heating : to be advised

Grmiss equipment area : A8
Radar :
Satnav :
Echo sounder :
Contact details - tlx :
       - phone :
       - fax :
       - email :

ISM (yes/no) : Yes
Fully ITF or equivalent : Yes
Oil company approvals : No

Next DD/SS :

Safety equipment and vessels operation to be as per class requirements, (IASC) and OCIMF recommendations and international regulations for ships of this type and trade

Clause 46
----
Vessel is at any time able to load cargoes in accordance with the coating-resistance list and as per vessels certificate of fitness (marpol 73/78) At any time prior to delivery or after, the owners undertake to arrange to list additional cargoes in accordance with charterers requirements always in accordance with vessels capabilities.

Clause 47
----
United Kingdom, Continent-Scandinavia -Baltic including St. Petersburg, ~ Mediterranean, Black Sea , west Africa, but excluding Libya and Israel. Otherwise always within IWL.
The vessel is not to be ordered to nor bound to enter any places where fever or epidemics are prevalent
Any delays due to vessel trading in ice to be for charterers account. Any delays due to vessel waiting for icebreaker assistance to be for charterers account. Icebreaker assistance to be for charterers account. Any additional bunker consumption due to vessel trading in ice to be for charterers account.
Vessel only to trade in ice and follow icebreaker out to the same extend as other vessel of similar size, iceclass and horsepower. It is, however understood that owners/master can not reject to sail in ice as far as it is obvious that there is no risk for damaging the vessel but final decission always to be in masters discretion.

Clause 48
----
The daily t/c hire for the 1st year is Euro 3,895,- pd/pr payable 15 days in advance.

Hire is inclusive of all overtime onboard,, sweeping of tanks and communication costs..
Any special cleaning chemicals/detergents at charterers request to be for charterers account otherwise to be for owners account.
Freshwater for cleaning order byCharterers to be for Charterers account.All other freshwater used to owners account.

Hire is payable every 15 days in advance to owners bank account.
Charterers may deduct from hire payments of any cash to master or any outlays for provision, stores etc. made by
charterers on owners behalf and any amount covering off-hire.
Communication cost to be evaluated after 6 months trading.
Escalation each year after expiry of 1st year charter to be 0,75 percent.

## Clause 49

Charterers have the right at any time during this charter period to make inspection of the vessel as they may consider
necessary after giving the master/owners 1 days notice. This may be exercised at such intervals as charterers in their
absolute discretion may determine, owners affording all necessary co-operation provided, however, that neither the exercise
nor the non-exercise by charters of such right, shall in any way reduce the masters or owners liability and responsibility, or
impose on charter any responsibility for the condition or operation of the vessel under this charter or otherwise.

## Clause 50

Vessel to be delivered with sufficient bunkers to reach first loading port.
Vessel to be redelivered with approximately same amount of bunkers as onboard on delivery.

## Clause 51

Vessel/master/crew must carry out commercial operations with outmost dispatch.
Any failure to continuously perform in accordance with the terms and condition of this charter party will entitle the charterers
to declare vessel off-hire.

## Clause 52

Owners warrant that the vessel is in all respect eligible under laws and regulation for trading to the ports and places specified
in the trading area, and that at all necessary times she shall have onboard all certificates, records and other documents
required for such service. Owners will be responsible for knowledge of and compliance with all port restrictions at the ports
that the vessel might call, related to safety and operational matters provided due notice is given to the master/owners for
obtaining such knowledge.
Charterers guarantee to call only safe accessible ports.

## Clause 53

Vessel/crew will maintain watch on all communication equipment on board in order to enable flexible and fast responses
concerning cargo plans, alterations of destinations, deviations and any other similar kind of commercial requirements.

## Clause 54

Vessel tonnage certificate always to state deduction for seperate ballast in Gross tons as per IMO resolutions. Owners to
cover all charterers consequential losses in case owners are failing to comply with this provision.

## Clause 55

Owners to give Charterers 15/10/7/5/3/2/1 days notice of delivery and vessel to be delivered with virgin tanks .

## Clause 56

It is masters duty to secure that the vessel is always clean, dry, free of smell and suitable when loading the concrete cargo
using the procedures and methods chosen by the master. In case there is any doubt whether a product is of a finer or less
fine quality the master always to use the cleaning procedure for the finest possible grade.

## Clause 57

Vessel to be equipped with minimum 2 cargo hoses each of 6 inch and each of 20 meters. All flanges to be of DIN standard.
Sufficient number and size of reducers and y-pieces to be onboard. Sufficient personnel on board is always to be made
available to charterers to load or discharge as many grades of cargo simultaneously as the vessel physically can.arte

## Clause 58

Owners warrant during the currency of this charter that:
A) The vessel is fully P and I covered
B) Premiums are correctly paid
C) Vessel is covered for oil spillage at U.S. Dollars 1 billion
D) The vessel will be owners or demise-chartererd by a member of the
International tanker owners pollution federation ltd'
E  The owners will give the charterers the full use and coverage of its P
and I club service as far as the P and I rules permit.
  The vessel is entered and covered by: Terra Nova, United Kingdom
  Hull and Machinery value: At present NOK 25,000,000,-
  Total loss value: NOK 37,500,000,-

## Clause 59

In the event of loss of time due to blockades of the vessel in any port or place by shore labour or others (whether arising
from government restrictions or not) by reason of

A) the vessel's flag or ownership/management/operation or control
B) the terms and conditions on which the members of the crew are employed
C) the trading of any other vessel under the same ownership/management/operation or control
D) Any physical or documentary deficiency in the relation to the vessels
  safety, cargo gear or other equipment as on board

Payment of hire shall cease for the time hereby lost and all expenses and
other consequences to be for owners account. to

Should the owners and/or their master/crew are involved and/or officially accused by any
state and/or government of smuggling of any kind and/or illegal use of- or selling/buying drugs and/or an criminal activities
governed by any state and or government, the charterers have the option to hold any of the aforementioned party(s) or
person, fully responsible for all costs and consequences arising from the above situation.

## Clause 60

Maximum 3 nationalities to be engaged onboard. Owners undertake to employ tanker experienced people only onboard the
vessel. During sea voyages and thoruhout loading and discharging owners warrant that vessels master, chief engineer and
chief officer speak, write and read english. Owners warrant that all other crewmembers have good enough working
knowledge of the english language to enable effictive cargo operations and safe communication with shore personnel.

## Clause 61

The cleaning of the vessels cargo tanks, pipes and pumps is to be performed by the vessels crew in charterers time, but at
any time day or night, sundays and holidays included upon charterers request. The cleaning operation in each case is to be
performed within areasonable amount of time to effect such cleaning, however it is agreed that the vessel is off-hire during
any period in excess of 12  hour that 1 complete tank cleaning may take. Butterworth machines and labour to be provided
by the vessel for owners account.
The vessels crew to sweep, mop or squeegee vessel tanks effectively during and after discharge if so required by charterers
or receivers. The term 'sweep' means puddling of cargo carried forward to pumps suction in the tanks to enable cargo
dreining to be discharged.

## Clause 62

The vessel can discharge a full cargo 1 grade within 8 hours against 100 PSI provided shore facilities permit. It is agreed
that the vessel is off-hire during any period in excess of  8 hours it may take for the vessel to discharge a full cargo, shore
facilities permitting. If shore facilities do not permit discharge within the agreed time, then master to have pumping logs and
issue letter of protest to receivers. Master to endeavour his utmost t have some protests and or pumpinglogs  duly
countersigned by the receivers/terminal. Should it become necessary to withdraw the vessel from the berth as a result of the
vessel being unable to discharge the cargo in accordance with the provisions stated above, all time and expense incurred is
for owners coount.

## Clause 63

Owners warrant that the vessel carries on board a certificate furnised as evidence pursuant to article VII of the 1969 International convention on civil liability for oil pollution damage. Owners further warrant that the said certificate will be maintained and effictive throughout the duration of this charter. Any delays and/or consequences arising from non-compliance with this clause to be for owners' account.

### Clause 64

It is understood that owners are taking care of all provisions, stores, change of crew, cash and other owners matters and pay for this service via their own agents in all ports and that charterers shall not be involved neither via their agents or otherside.

### Clause 65

Owners agree to follow charterers instructions with respect to handling of oily residues and tank washings and otherwise throughout the period of this charter, provided such instructions are not in breach of local law and international conventions.

### Clause 66

Owners shall accept delivery of cargo without presentation of original bill of lading but against letter of indemnity as per P and I wording with or without bank guarantee and to release cargo on receipt of letter of indemnity in the same manner as the charter do for their own vessels.

### Clause 67

Owners agree that the master/crew will connect/disconnect cargo and bunker hoses on board vessel if required.

### Clause 68

Charterers have the option to load and/or discharge by lighterage operation.
As far as possible such operation shall be carried out in conformity with the provisions in the ICS ship to ship transfer guide.
Charterers always to obtain permission from proper authorities to perform lightering.
Owners to supply vessel with tractorlines which to be used when vessel are performing STS inside a safe port/anchorage.
If Charterers are performing STS operation in open water then Charterers are to supply sufficient/adequate fenders/hoses etc for such operation.
The charterers have the option of loading over top le through the deck hatches.

### Clause 69

Charterers have the option to trade vessel basis reduced speed and owners will exercise their best endeavor Number of manifolds each side   ours under such reduced speed to maximise the vessels performance, but reduces speed always to be harmless to vessels main engine and in masters discretion.

### Clause 70

The vessel is operated in accordance with the recommendations contained in the latest edition of ICS, and the international safety guide for oil tankers and terminals (ISGOTT).
The owners warrant that the vessel and owners organisation is in fully compliance with latest IMO operation regarding tanker safety. Any delays and/or consequences arising from non-compliance with this clause to be for owners account.

The owners warrant that the vessel will be at all times in compliance with the marpol regulations currently in force or as possible amended during the validity of this charter, is certified to carry cargoes with pollution category a+b+c+d and has a corresponding valid certificate at all times on board. Failure to comply any loss of time and/or costs to be for owners account.

### Clause 71

Charterers to supply gasoil of quality according to ISO-F-DMA max specific gravity 0,86 max sulphor 0,5 per cent.

### Clause 72

Charerers option to have on board a supercargo paying owners a rate of Euro 12,- per day provided facilities for such person is available. Such stays on board may be repeated if approciate.

Clause 73

During the currency of this charter owners to meet charterers company policy of keeping a good house-holding onboard the vessel and keep vessels clean on deck, the outside, the the accommodation and in the engine room.

Clause 74

The owners warrant to have a policy on drug and alcohol applicable to the vessel which meets or exceeds the standard in the oil companies international marine forum guidelines for the control of drug and alcohol onboard ship I O.C.I.M.F., January 1990. An objective of the policy should be that the frequency of the unannounced testing is adequate to act as an effective abuse deterrent and that all crew shall be tested at least once a year through a combined program of unannounced testing and routine medical examinations.

Owners warrant that this policy will remain in full force and affect during this charter and the owners will exercise due dilligence to ensure that the policy is complied with.

Clause 75

Owners warrant vessel fully complies with all ITF requirements or equivalent, and vessel has a valid ITF certificate or equivalent onboard.

Clause 76

Owners have the right at any time during the duration of the above charter to sell the vessel subject to charterers prior approval of such buyers. The sale can only be done on the basis of new owners being fully responsible for a 100 percent fulfillment of the timecharter party. The charterparty shall in no way be affected nor changed or terminated due to a possible sale. Approval of such buyers not to be unreasonably withheld.

Charterers to have the right of calling for a purchase of the vessel during the period of April 1 - 30 , after expiry of the 3rd year charter period. If such option is declared the vessel shall be delivered in the July of the same year. The prices shall be

| | | |
|---|---|---|
| year 3 | price euro | 4,360.000.- |
| year 4 | price euro | 4,125,000.- |
| year 5 | price euro | 3,850.000.- |
| year 6 | price euro | 3,620.000.- |
| year 7 | price euro | 3.390.000.- |
| year 8 | price euro | 3,160.000.- |
| year 9 | price euro | 2,930.000.- |
| year 10 | price euro | 2,700.000.- |

4 percent sales commission is payable to C H Olsen A/S and Amika Ltd. for equal division.

Clause 77

Charterers have the option to change name of the vessel before or during the currency of the Charter Party. All costs involved to be for Charterers Account.

Clause 78

All contents of this charter party shall be kept strictly private and confidential by all parties involved.

Clause 79

The owners of Fornship A/S to personally gurantee for the amount of Euro 116,850,- for the first 4 (four) years of this Charter party. This guarantee shall stand as owners guarantee for the fulfillment of this Charter Party.

END OF ADDITIONAL CLAUSES.

# EXHIBIT 2

CLAIMANTS COPY

**NOT FOR SERVICE OUT OF THE JURISDICTION**

| | |
|---|---|
| **Claim Form** | In the High Court of Justice<br>Queen's Bench Division<br>Commercial Court<br>Royal Courts of Justice |

| | *For court use only* |
|---|---|
| Claim No. | 2007 Folio 463 |
| Issue date | 17th April 2007 |

SEAL 17 APR 2007

Claimant(s)

(1) SIMONSEN CHARTERING APS and (2) REDERIET M.H. SIMONSEN
both of Christiansmindevej 74, 5700 Svendborg, Denmark

Defendant(s)

FONNSHIP A/S

The amount of money claimed is US$98,845, which, converted at the rate of exchange of 0.50431, is equivalent to £49,348.

| Name and address of Defendant receiving this claim form | Amount claimed | US$98,845<br>(£49,348) plus a declaration for an indemnity |
|---|---|---|
| Fonnship A/S<br>5953 Fonnes<br>Norway | Court fee | £1,700 |
| | Solicitor's costs | To be assessed |
| | Total amount | |
| | Issue date | |

Does, or will your claim include any issues under the Human Rights Act 1998? ☐ Yes ☒ No

The court office at the Admiralty & Commercial Registry, Royal Courts of Justice, Strand, London WC2A 2LL is open between 10am and 4.30pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

© Reproduced by Richards Butler LLP with the permission of the Controller of Her Majesty's Stationery Office
N1(CC) Claim Form

Claim No.

Brief details of claim

By a charterparty dated 11th April 2003 (the "Charterparty"), the Defendant as owners of the MT "SAVA STAR" (renamed MT "ORASTAR") (the "Vessel") chartered the Vessel to the Claimant for a period of 4 years. Pursuant to, inter alia, Clauses 46 and 70 of the Charterparty, the Defendant warranted that the Vessel would be able to trade in accordance with IMO Regulations II and III throughout the duration of the Charter. Whereas the Vessel does not comply with the said IMO Regulations, and as a result of the Defendant's breaches of warranty in this regard, the Vessel's ability to trade is limited and the Claimant has suffered various losses and damage and will incur further losses and damage in the future as a result of such breach.

AND THE CLAIMANT CLAIMS:

1.  US$98,845

2.  Alternatively to 1, above, damages

3.  A declaration for an entitlement to an indemnity in respect of any future losses and damages that the Claimant will suffer as a result of the Defendant's breaches of warranties;

4.  Interest pursuant to Section 35A of the Supreme Court Act 1981; and

5.  Costs.

Particulars of claim will follow if an Acknowledgment of service is filed that indicates an intention to defend the claim.

| Statement of Truth | | |
| --- | --- | --- |
| The Claimant believes that the facts stated in this claim form are true. | | |
| *I am duly authorised by the claimant to sign this statement | | |
| Full name | | |
| Name of Claimant's solicitor's firm: | Reed Smith Richards Butler LLP | |
| Signed | Position or office held (if signing on behalf of firm, company or corporation) | Associate |
| Claimant's solicitor Date  17 · 4 · 07 | | |

Claim No.

Reed Smith Richards Butler LLP
Beaufort House
15 St Botolph Street
London   EC3A 7EE

Fax:    020 7247 6555

Claimant's solicitor's address to which
documents or payments should be sent if
different from overleaf including (if
appropriate) details of DX, fax or e-mail.

4522264



Claim No: 2007 Folio 463

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**BETWEEN:**

**(1) SIMONSEN CHARTERING APS**
**(2) REDERIET M.H. SIMONSEN APS**

**Claimants**

-and-

**FONNSHIP A/S**

**Defendants**

## AMENDED PARTICULARS OF CLAIM

### Background

1. The Defendants are and were at all material times the owners of the vessel M/T "ORASTAR" (formerly "SAVA STAR: "the Vessel").

2. The Claimants (in each case) are and were at all material times a company registered according to the laws of Denmark and involved in the carriage and trading of *inter alia* vegetable oils and other liquid products.

3. On 11 April 2003, being the same time and date as the conclusion of the Charterparty to which reference is made below, a further agreement was also concluded between the Claimants and the Defendants in connection with the Vessel ("the Original Agreement") that:

    (1) The Defendants would convert and/or rebuild the Vessel, which was (prior to the Charterparty) a dry cargo vessel, as a tanker vessel designed specifically for the carriage of *inter alia* such vegetable oils as were subsequently referred to in the Vessel's *"coating resistance list"* and/or

1

"*Certificate of Fitness*" as referred to in Clause 46 of the Charterparty and/or such cargoes as were within the description of "*pollution category a+b+c+d*" as referred to in Clause 70 of the Charterparty (as to which, see further below).

(2)   In consideration therefor, and in reliance on the original Agreement, the Claimants would conclude the Charterparty with the Defendants and take delivery of the Vessel thereunder once the said conversion and/or rebuilding work was complete.

4.   The parties duly concluded the Charterparty on 11th April 2003.

5.   Following the conclusion of the Charterparty, and during the course of the said conversion and/or rebuilding work, the Claimants repeatedly advised the Defendants to the effect that (as had already been widely publicised within the liquid products carriage trade as a result of the proposed adoption by MARPOL of Resolution MEPC.118(52), which occurred on 15 October 2004);

(1)   The international regulations governing the carriage of vegetable oils and in force as at the date of the Original Agreement and the date of conclusion of the Charterparty (contained in Annex II of the International Convention for the Prevention of Marine Pollution from Ships, 1973, as modified by the Protocol of 1978 relating thereto (MARPOL 73/78): "MARPOL") would, pursuant to the adoption of Resolution MEPC.118(52), change as from 1st January 2007.

(2)   In this regard, pursuant to the said Resolution MEPC.118(52), Annex II of MARPOL would be revised, with the revised Annex II duly entering into force on 1 January 2007.

(3)   Pursuant to the revision of the said Annex II, *inter alia:*

2

(a)   A new four-category categorization system for noxious and liquid substances would be introduced, replacing the former categories of A, B, C, D and other substances with categories X, Y, Z and other substances ("OS").

(b)   Vegetable oils, previously characterized as being unrestricted under the former Annex II, would be restricted to carriage within certain vessels.

(c)   Consequently, pursuant to Regulation 11 of Annex II, vegetable oils would be required to be carried in "chemical tankers", as defined in the International Code for the Construction and Equipment of Ships Carrying Dangerous Cargoes (the IBC Code), as revised in December 2004, and/or vessels modified in order to satisfy the revised Regulations.

(d)   As a result, the revision to Annex II would, unless the conversion and/or rebuilding of the Vessel was effected so as to take account of the said revision, have the effect of reducing the number of different types of liquid cargoes that the Vessel could carry from about 140 to 24, and would render the Vessel unsuitable for the carriage of vegetable oils.

(4)   Accordingly, it would be necessary to ensure that the Vessel was delivered in a condition which enabled her to carry vegetable oils (as expressly contemplated by the parties in the terms of the Original Agreement) in compliance with the revised Annex II of MARPOL.

### The Charterparty

6. Against the background of the matters stated above, by a time charterparty concluded on an amended Shelltime 4 form with additional clauses dated 11th April 2003 between the First and/or Second Claimants ("the Claimants") and the Defendants, the Claimants agreed to charter the Vessel for a period of 4 years, 15 days more or less in the Claimants' option, with up to 6 further extensions of one year each in the Claimants' option ("the Charterparty").

7. The Charterparty, to which the Claimant will refer and rely on as may be necessary for its full terms, meaning and effect, provided, *inter alia*, as follows:

*"Description and Condition of Vessel*

1. *At the date of delivery of the vessel under this charter*
   (a) *she shall be classed; B.V.*
   (b) *she shall be in every way fit to carry See additional clause 44 and/or its products;*

   ...
   (g) *she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay;*
   (h) *she shall comply with the description ... as per additional clause 45 appended hereto ...*

*Duty to Maintain*

3. (i) *Throughout the charter service Owners shall, whenever the passage of time, ... or any event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain ... or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.*

   (ii) *If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure .... Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy available to Charterers ....*

4

*Period Trading Limits*

4.    ...

> *The vessel shall be delivered by Owners at a port in DOP 1 safe port UK-*
> *Continent or Mediterranean (sic), where the vessel will be rebuilt ...*

<u>*Clause 44:*</u>

*Insertion to read: in case of disputes not exceeding Dkk 200,000, same to be*
*referred to Copenhagen Sø & Handelsret under danish law according to small*
*claims procedure as currently in force.*

<u>*Clause 45:*</u>

...

*Type of vessel*        *:FLS tanker*

...

*Type of coating*       *:Marineline 734*

...

<u>*Clause 46:*</u>

*Vessel is at any time able to load cargoes in accordance with the coating*
*resistance list and as per vessels certificate of fitness (marpol 73/78) At any time*
*prior to delivery or after, the owners undertake to arrange to list additional*
*cargoes in accordance with charterers requirements always in accordance with*
*vessels capabilities.*

...

<u>*Clause 70:*</u>

*... The Owners warrant that the vessel will be at all times in compliance with the*
*marpol regulations currently in force or as possible amended during the validity*
*of this charter, is certified to carry cargoes with pollution category a+b+c+d and*
*has a corresponding valid certificate at all times on board. Failure to comply any*
*loss of time and/or costs to be for owners account. "*

8.    The reference in clause 1(b) of the Charterparty to Clause 44 is plainly a typographical or other error and ought to be a reference to clause 46 of the Charterparty. If and to the extent that it may be necessary to do so, the Claimants will contend that the Charterparty stands to be rectified accordingly.

9.    Provided with these Particulars of Claim (as Attachments 1 to 3 hereto) are copies of the following:

    (1)    The Charterparty (Attachment 1).

    (2)    The "*coating resistance list*" to which reference is made in Clause 46 of the Charterparty ("the Cargo List": Attachment 2), and which includes, *inter alia*, reference to vegetable oils.

    (2)    The Vessel's International Pollution Prevention Certificate for the Carriage of Noxious Liquid Substances in Bulk ("INLS Certificate") as at the date of delivery under ~~Certificate of Fitness (MARPOL 73/78) within the meaning of Clauses 46 and/or 70 of the Charterparty as at the date of conclusion of~~ the Charterparty (Attachment 3; see further below).

    (3)    Annex II of the International Convention for the Prevention of Marine Pollution from Ships, 1973, as modified by the Protocol of 1978 relating thereto (MARPOL 73/78) ("MARPOL"), as in force at the date of conclusion of the Charterparty (Attachment 4).

10.    For the avoidance of doubt:

    a.    references in Clause 70 of the Charterparty to cargoes with pollution categories a, b, c and d are references to the noxious liquid substances

6

referred to in, *inter alia*, Regulations 1(6) and Regulation 3 of MARPOL Annex II;

b.    the expression "certificate of fitness (marpol 73/78)" in Clause 46 of the Charterparty referred to the Vessel's INLS Certificate, on the proper construction thereof;

c.    the expression "certificate" in Clause 70 of the Charterparty referred, on the proper construction thereof, to the Vessel's INLS Certificate and/or any other certificate which the Vessel was or might subsequently be required to have, in order to carry noxious liquid cargoes falling within MARPOL pollution categories A, B, C or D including, in particular, an International Certificate of Fitness for the Carriage of Dangerous Chemicals in Bulk issued under the IBC Code ("IBC Certificate of Fitness").

11.    Against the background of the matters referred to in paragraphs 1 to 5 above, and upon the true and proper construction of the Charterparty, and in particular the Clauses referred to in paragraph 7 above, the Defendants warranted to the effect that:

(1)    The Vessel would at all times throughout the duration of the Charterparty be capable of carrying the cargoes listed in the Cargo List and/or in the list attached to the Vessel's INLS Certificate ~~of Fitness~~ as at the date of delivery under ~~conclusion of~~ the Charterparty, including (but not limited to) cargoes of vegetable oils.

(2)    The Vessel would at all times throughout the duration of the Charterparty be certified to carry the cargoes listed in the Cargo List and/or certified to carry cargoes which were noxious liquid substances, being any substance designated in Appendix II to Annex II of MARPOL or provisionally

assessed under the provisions of Regulation 3(4) of MARPOL as falling
into Category a, b, c or d.

(3)     The Vessel would at all times throughout the duration of the Charterparty
        comply with the requirements of MARPOL and all amendments thereto
        including (without limitation) Annex II of MARPOL.

(4)     The Vessel would at all times have:

        a.      a valid INLS Certificate ~~of Fitness~~, issued in accordance with
                MARPOL, enabling her to carry the cargoes listed in the Cargo
                List and/or in the list attached to the Vessel's INLS Certificate ~~of
                Fitness~~ as in force at the date of <u>delivery under</u> ~~conclusion of~~ the
                Charterparty, including (but not limited to) cargoes of vegetable
                oils; and

        b.      <u>insofar as was required by MARPOL, including any amendment
                thereto, to enable her to carry such cargoes, a valid IBC Certificate
                of Fitness</u>.

(5)     Due diligence would be exercised at all times throughout the duration of
        the Charterparty so as to maintain or (as necessary) restore the Vessel to a
        condition whereby she could lawfully carry the cargoes listed in the Cargo
        List and/or in the list attached to the Vessel's INLS Certificate ~~of Fitness~~
        as at the date of <u>delivery under</u> ~~conclusion of~~ the Charterparty.

## Performance of the Charterparty

12.     The Vessel was duly delivered to the Claimants under the Charterparty at Gdansk,
        Poland, on 25 October 2004.

13. Despite the matters referred to in paragraph 5 above, at the time of delivery the Vessel's construction and equipment was only such as to permit the lawful carriage of vegetable oil cargoes under MARPOL prior to the revision thereto which came into effect on 1st January 2007.

14. Thus, as evidenced by the Cargo List, at the time of her delivery, the Vessel was certified to carry about 140 different cargoes, including (without limitation) vegetable oils.

**Revision of MARPOL Annex II**

15. As stated above:

(1) Pursuant to Resolution MEPC.118(52) adopted on 15th October 2004, Annex II of MARPOL was revised, with the revised Annex II entering into force on 1 January 2007. A copy of the revised Annex II is provided herewith as Attachment 5 hereto.

(2) The said revision had the effect set out in paragraph 5(3) above.

16. In the premises:

(1) Since 1st January 2007, and pursuant to the revised MARPOL Annex II, the Vessel is not permitted to carry the same cargoes of vegetable oils as before that date.

(2) In this regard, by reason of the revision to MARPOL Annex II, the list of cargoes that the Vessel can carry has been very significantly reduced from about 140 to only 24, as evidenced by the Vessel's current INLS

9

Certificate of Fitness dated 15th March 2007 (a copy of which is provided herewith as Attachment 6 hereto).

(3)    Accordingly, without modification, the Vessel is unable to comply with the Defendants' obligations under the Charterparty as set out in paragraph 11 above.

(4)    Whereas the Claimants have not been informed by the Defendants as to what modifications have already been carried out to the Vessel for the purpose of the Vessel complying with the requirements of MARPOL Annex II, it is understood that the Defendants have completed most if indeed not all of the modifications required for the purpose of the Vessel complying with the requirements of the revised MARPOL Annex III. The revisions to MARPOL Annex III, which regulates the carriage of harmful substances carried in packaged form, are due to enter into force on 1 January 2010. Despite such modifications having been carried out, the Defendants have failed to provide the Claimants with the requisite IMO certificate confirming such compliance with MARPOL Annex III despite the Claimants; numerous requests for such certificate to be provided.

## The Defendant's breach of contract

17.    In the premises, the Defendants are in breach of the warranties set out in paragraph 11 above and/or in breach of Clauses 3(i) and/or 45 and/or 46 and/or 70 of the Charterparty. In this regard:

(1)    The Claimants will rely upon the facts and matters pleaded above as sufficient evidence of the Defendants' breach as aforesaid.

10

(2)    Further and/or alternatively, and without prejudice to the foregoing, the
       Claimants will contend that:

    (a)·   In breach of Clauses 46 and/or 70 of the Charterparty, the Vessel is
       no longer capable of carrying and/or is no longer certified to carry
       all of the cargoes listed in the Cargo List and/or the list attached to
       the Vessel's INLS Certificate of Fitness as at the date of delivery
       under conclusion of the Charterparty.

    (b)    The Vessel is no longer capable of shipping vegetable oils in
       accordance with the requirements of MARPOL Annex II.

    (c)    The Vessel no longer has an INLS Certificate of Fitness, issued in
       accordance with MARPOL, and she does not have an IBC
       Certificate of Fitness, issued in accordance with the IBC Code,
       which would enables her to carry the cargoes listed in the Cargo
       List and/or the Vessel's INLS Certificate of Fitness as at the date
       of conclusion of delivery under the Charterparty, including (but not
       limited to) cargoes of vegetable oils.

    (d)    Without prejudice to the burden of proof, the Defendants have
       failed to exercise due diligence in order to maintain the Vessel in
       and/or restore the Vessel to the condition referred to in Clauses
       1(b), (g) and/or (h) and/or Clause 45 and/or Clause 46.

18.    Further or alternatively, and in the same premises, the Defendants are in breach of
       the Original Agreement in that the Vessel is no longer capable of the carriage of
       *inter alia* such vegetable oils as are referred to in the Vessel's *"coating resistance
       list"* and/or *"Certificate of Fitness"* as referred to in Clause 46 of the Charterparty

11

and/or such cargoes as are within the description of *"pollution category
a+b+c+d"* as referred to in Clause 70 of the Charterparty.

**Loss and Damage**

19.    By reason of the facts and matters set out above, the Claimants have suffered loss
and damage, including (without limitation) loss and damage sustained by way of
the loss of fixtures for the carriage of vegetable oils that the Vessel was due to
perform on behalf of the Claimants but is, as of 1st January 2007, no longer able
to perform.  The fixtures lost to date include, but are not limited to the following,
and which amounts to total losses to date of US$228,112:

| Voyage no. | Charterers | Load/Discharge ports | Loss |
|---|---|---|---|
| 01 | Cargill | Liverpool/Hamburg | US$37,140 |
| 02 | Yara | Kallingrad/Immingham | EUR26,428 |
| 03 | Cargill | St Nazaire/Liverpool | US$26,230 |
| 04 | Toepfer | Rotterdam/Leixoes | EUR10,376 |
| 05 | Cargill | St Nazaire/Liverpool | US$27,030 |
| 06 | Cargill | Hull/Hamburg | EUR1,177 |
| 07 | Cargill | St Nazaire/Liverpool | US$28,137 |
| 08 | Sasol | Hamburg/Setubal | EUR23,048 |
| 09 | Cargill | St Nazaire/Liverpool | US$27,212 |
| **TOTAL** | | | **US$228,112** |

20.    In the premises, the Claimants have suffered loss and damage to date in the sum
of US$228,112 and are entitled to damages accordingly.

12

21.  Further and/or alternatively, by reason of and without prejudice to the facts and matters stated above, the Claimants are entitled to damages in respect of any and all loss and damage arising in the future as a result of the Defendants' breach and/or breaches of contract as set out above.

22.  Further and/or in the further alternative, by reason of the facts and matters set out above, the Claimants are, pursuant to Clause 3(ii) of the Charterparty, entitled to a reduction in any hire due and/or which becomes due to the Defendants under the Charterparty in a sum equivalent to those claimed above.

23.  Further and alternatively, and pursuant to Clause 70, any time lost or spent and any cost incurred by reason of the matters aforesaid is for the Defendants' account, and the Claimants are relieved of the need to pay hire and/or incur other expense accordingly.

24.  Further, the Claimants claim interest on all sums found to be due to them, pursuant to section 35A of the Supreme Court Act 1981, at such commercial rate and for such period as the Court considers just.

AND THE CLAIMANTS CLAIM:

(1)  US$228,112, alternatively damages.

(2)  A declaration to the effect that the Claimants are entitled to damages in respect of any and all loss and damage arising in the future as a result of the Defendants' breach and/or breaches of contract.

(3)  Damages accordingly.

13

(4)     A declaration to the effect that the Claimants are entitled to a reduction in any hire
        due and/or which becomes due to the Defendants under the Charterparty in a sum
        equivalent to those claimed above.

(5)     A reduction in hire, and any associated relief, accordingly.

(6)     A declaration to the effect that any time lost or spent and any cost incurred by
        reason of the matters aforesaid is for the Defendants' account, and the Claimants
        are relieved of the need to pay hire and/or incur other expense accordingly.

(7)     Associated relief, accordingly.

(8)     Interest, pursuant to section 35A of the Supreme Court Act 1981.

(9)     Costs.

                                                                    NEVIL PHILLIPS

**Statement of Truth**

The Claimant believes that the facts stated herein are true.

I am duly authorised by the Claimant to sign this statement.

Full name... HECWE...... MARIE..... KEWESINO

Position... ASSOCIATE.................................

Signed...... H. M. Kassist.................

Served this 30ᵗʰ day of May 2007 by Reed Smith Richards Butler LLP, solicitors for the
Claimants

Reserved this         day of October 2007 by Reed Smith Richards Butler LLP, solicitors
for the Claimants

                                    14